OPINION
{¶ 1} Defendant-appellant Joseph L. Bowshier appeals from his conviction and sentence for Possession of Cocaine in an Amount Greater than 5 Grams, but not Greater than 25 Grams. He received a maximum sentence of eighteen months in prison, to be served consecutively with any sentence imposed as a result of a violation of probation for a previous federal offense.
 {¶ 2} Bowshier contends that the trial court erred in denying his motion to suppress evidence allegedly obtained as the result of an unlawful search and seizure. He also contends that the trial court erred in imposing a maximum sentence. We conclude that the record fails to establish that there was an unlawful search or seizure, so that the trial court did not err in denying Bowshier's motion to suppress. As to the sentence, we conclude that State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, compels us to reverse Bowshier's sentence, only, and remand this cause for re-sentencing in accordance with Foster.
 I {¶ 3} In early April, 2004, Bowshier was a passenger in a car being driven by James Ollinger, who was stopped by Springfield Police Officer Robert Tate for speeding. Tate described what happened next as follows:
 {¶ 4} "A. They both began to get out of the car when I pulled in behind them. I asked them to both have a seat back in the car; and the drivers [sic] kind of looked at me, `You want to have a seat.' I told him to have a seat and close the door. His face appeared flushed and his eyes were glassy.
 {¶ 5} "He did eventually sit back down, and I repeatedly asked him to close the door; but he didn't. I ended up having to close the door for him. He didn't have any I.D. on him.
 {¶ 6} "He asked a juvenile that was in the yard to go in the house and get his driver's license. His speech was slurred, and there was a strong odor of an alcoholic beverage coming from his breath; and there were also several beer bottles laying about the car.
 {¶ 7} "Q. And you could see that just from standing outside the car?
 {¶ 8} "A. Yes.
 {¶ 9} "Q. Now, did you have an opportunity at that point to ask him if he had been drinking that day?
 {¶ 10} "A. Yes. He said he wasn't going to lie to me. He had 12 to 18.
 {¶ 11} "Q. After that did you put him through some field sobriety tests?
 {¶ 12} "A. Yes. Officers Baader and Lewis and Green arrived, and then I conducted field sobriety tests with the assistance of Officer Green.
 {¶ 13} "Q. And following that field sobriety test, was Mr. Ollinger taken into custody for OMVI?
 {¶ 14} "A. Yes.
 {¶ 15} "Q. And you also charged him for the speed as well, I think; is that correct?
 {¶ 16} "A. Yes.
 {¶ 17} "Q. But — his arrest was for driving under the influence?
 {¶ 18} "A. Correct.
 {¶ 19} "Q. Now, after that you'd say that some other officers had arrived; and that's what allowed you to do the field sobriety test. Were they with Mr. Bowshier, then, while you were conducting that field sobriety test?
 {¶ 20} "A. Yes.
 {¶ 21} "Q. And after you took Mr. Ollinger into custody and more specifically after you had arrested him for the OMVI, did you take the opportunity to conduct a search of his vehicle?
 {¶ 22} "A. Yes.
 {¶ 23} "Q. You say that you had noticed some beer bottles from outside of the car. Did you observe those when you conducted this search then?
 {¶ 24} "A. Yes. I wanted to determine if the bottles were open or not.
 {¶ 25} "Q. Okay. And while you were doing that and observing these bottles to see if they were open, did you notice anything else that was unusual about the car?
 {¶ 26} "A. Yes. Just to the left of where the defendant was sitting in his foot [sic] between the two seats there was a plastic baggie sticking up between the seats. The end of it was tied off in a knot, which I recognized to be a normal way that drugs are carried.
 {¶ 27} "Q. In your experience and years with the Springfield Police Department, have you had an occasion to find drugs either on people's persons or in their vehicles when you've made stops in the past?
 {¶ 28} "A. Yes.
 {¶ 29} "Q. And can you give us some characterization of approximately how many times that may have occurred during those years?
 {¶ 30} "A. Easily over the hundreds.
 {¶ 31} "Q. Okay. And in that experience, have you found that oftentimes drugs are packaged or carried in such a way that a plastic baggie is used as a carrying method?
 {¶ 32} "A. Yes.
 {¶ 33} "Q. When we talk about plastic bags, we're talking like a plastic sandwich baggie?
 {¶ 34} "A. Correct.
 {¶ 35} "Q. And not a Ziplock or the normal kind?
 {¶ 36} "A. The normal.
 {¶ 37} "Q. It was tied at the top in a knot?
 {¶ 38} "A. Yes.
 {¶ 39} "Q. Did you observed any more of this baggie as you were looking through the car as well?
 {¶ 40} "A. Yes. When I pulled that — well, I attempted to pull the bag out from between the seats, just the top part of it came off; and I could tell it was ripped. And I checked under the seat, and the remainder of the baggie was there. It was full of a white powder which I believed to be powder cocaine.
 {¶ 41} "Q. And you seized it as a result of that?
 {¶ 42} "A. Yes.
 {¶ 43} "Q. After that was Mr. Bowshier taken into custody and arrested for possession of powder cocaine?
 {¶ 44} "A. Yes."
 {¶ 45} Later, on cross-examination, Tate testified as follows:
 {¶ 46} "Q. And when you pulled half of that baggie out, did any of that white powder spill at that point?
 {¶ 47} "A. There was already — there was some white — some powder in the top of the white baggie, and there was also white powder already on the edge of the seat there."
 {¶ 48} Bowshier moved to suppress the evidence, contending that it was obtained as the result of an unlawful search and seizure. Following a hearing, the trial court denied the motion to suppress.
 {¶ 49} Following a jury trial, Bowshier was convicted of Possession of Cocaine in an amount greater than five grams, but not greater than 25 grams. He was sentenced to imprisonment for eighteen months, the maximum sentence, and the trial court ordered the sentence to be served consecutively with any sentence Bowshier might receive as a result of violating his probation for a previous federal offense. From his conviction and sentence, Bowshier appeals.
 II {¶ 50} Bowshier's First Assignment of Error is as follows:
 {¶ 51} "THE TRIAL COURT ERRED IN ADMITTING THE SEIZED COCAINE INTO EVIDENCE AS IT WAS OBTAINED AS A RESULT OF AN ILLEGAL SEARCH."
 {¶ 52} Bowshier contends that Officer Tate had no right to search the interior of the car, or even to enter the interior of the car, after arresting Ollinger for OMVI. We disagree. Open or closed, the beer bottles Tate saw in the car, while he was standing outside, constituted evidence that would have obvious relevance to a prosecution for OMVI, and Tate had the right to enter the car to seize that evidence, if for no other reason. Furthermore, when a police officer makes a lawful custodial arrest of an occupant of an automobile, he may, as a search incident to that arrest, search the passenger compartment of the automobile. State v. Murrell (2002), 94 Ohio St.3d 489,764 N.E.2d 986, following New York v. Belton (1981), 453 U.S. 454.
 {¶ 53} Bowshier contends that Tate had no right to seize the plastic baggie he saw in the car, because he lacked probable cause. In view of Officer Tate's testimony linking the carriage of drugs with plastic baggies, we conclude that he had probable cause to remove the baggie to look at it, at least, in order to determine if it contained drugs. Also, Officer Tate's testimony on cross-examination lends itself to a reasonable interpretation that he had already observed white powder in the upper portion of the baggie that he could see, and on the edge of the seat, even before he picked up the baggie, which would strengthen his reasonable belief that the baggie contained cocaine.
 {¶ 54} We conclude that the record fails to demonstrate that the search and seizure of the plastic baggie containing powder cocaine was unreasonable or unlawful. Bowshier's First Assignment of Error is overruled.
 III {¶ 55} Bowshier's Second Assignment of Error is as follows:
 {¶ 56} "THE TRIAL COURT ERRED IN SENTENCING APPELLANT TO THE MAXIMUM ALLOWABLE TERM OF INCARCERATION FOR THE OFFENSE HE WAS CONVICTED OF."
 {¶ 57} Bowshier contends that the findings required by R.C.2929.14(C) required for a maximum sentence are not supported by the record. The statutory requirement of findings for a maximum sentence is a part of the sentencing statute declared unconstitutional, and hence severed, by State v. Foster,109 Ohio St.3d 1, 2006-Ohio-856. Pursuant to ¶ 104 of Foster,
supra, all sentences involving the unconstitutional part of the statute, pending on direct review when Foster was decided, must be remanded for re-sentencing in accordance with Foster. This is a sentence of that kind. Accordingly, Bowshier's Second Assignment of Error is sustained to that extent.
 IV {¶ 58} Bowshier's First Assignment of Error having been overruled, and his Second Assignment of Error having been sustained on the authority of State v. Foster, supra, the sentence imposed by the trial court is Reversed, the judgment of the trial court is Affirmed in all other respects, and this cause is Remanded for re-sentencing in accordance with State v.Foster.
Grady, P.J. and Wolff, J., concur.