## UNITED STATES of America, Plaintiff–Appellee,

v.

## Marcus A. ADAMS, Defendant–Appellant.

### No. 93–3034.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1994.

Decided June 8, 1994.

Gail Joy Hoffman (argued), Office of the U.S. Atty., Milwaukee, WI, for plaintiff-appellee.

Nikola Kostich (argued), Styler, Kostich, Lebell, Dobroski & McGuire, Milwaukee, WI, for defendant-appellant.

Before CUMMINGS, KANNE and ROVNER, Circuit Judges.

CUMMINGS, Circuit Judge.

In April 1993 defendant Marcus Adams was convicted of one count of possession of a firearm by a convicted felon (18 U.S.C. §§ 922(g)(1), 924(a)(2)). In August 1993 he was sentenced to 51 month's imprisonment, to be followed by three years' supervised release. Defendant Adams now appeals his conviction claiming, among other things, that the district court erroneously denied his motion to suppress the evidence which formed the basis of the charge against him.

### Facts

On November 4, 1992, a United States Magistrate Judge in Milwaukee, Wisconsin, issued a search warrant for the upper flat of a building located at 2773 N. 45th Street in that city. No mention was made in the warrant of defendant Adams or of the yellow Cadillac in which the evidence at issue here

was eventually found. In anticipation of the execution of that warrant, Detective Bryan Popowski of the Milwaukee County Sheriff's Department positioned himself approximately two hundred feet from the house in question. About 25 minutes after his arrival Detective Popowski observed two men, one of whom was defendant Marcus Adams, exit the yard in front of the house and proceed to the middle of the street, where they stood talking. Detective Popowski believed that the two men had come from inside the house under surveillance. It is not clear, however, whether Detective Popowski conveyed this belief to the officers who eventually searched defendant Adams and his vehicle.

The two men who had exited the yard in front of the target residence stationed themselves between two parked vehicles, a Ford Bronco (that Detective Popowski claimed to have seen in front of the house in question on previous occasions) parked on the side of the street closest to the house, and a yellow Cadillac (apparently owned by Adams) parked directly opposite it. While the men were in the street, Detective Popowski saw and heard the Ford Bronco's car alarm being deactivated.

A few minutes later, members of the Milwaukee Sheriff's Department's tactical team arrived in an unmarked van and an unmarked car. As the vehicles approached, defendant Adams and the other individual moved toward the curb, behind the yellow Cadillac. The Sheriff's van stopped approximately 15 feet behind the Cadillac, and the unmarked car stopped approximately 15 feet behind the van. Officers wearing jackets identifying them as law enforcement officials then rushed out of the van and towards the house. At this point, the individual standing next to defendant Adams ran from the scene and was immediately pursued by Detective Darrel Fisher, who had arrived in the unmarked car. Detective Fisher's partner, Sergeant James Ganey, approached defendant Adams, who made no effort to flee.

Sergeant Ganey identified himself and began to pat down defendant Adams in order to ascertain whether he had any weapons. Sergeant Ganey felt a sizeable object in the front pocket of defendant Adams' warm-up pants. Unable to identify the object—and apparently believing it might be a weapon—Sergeant Ganey removed the article and discovered that it was a roll of currency slightly smaller in diameter than a beverage can.

Sergeant Ganey then handcuffed defendant Adams and turned him over to the custody of another law enforcement officer. At the suppression hearing, the magistrate judge determined that at this point the detention of Adams ceased being merely an investigatory stop and became an arrest. Several minutes later, a dog trained in the detection of controlled substances was allowed to sniff the roll of money found on Marcus Adams and immediately alerted to the currency.[1] As the dog was sniffing the money, the lights on the yellow Cadillac flashed, the locks disengaged and the trunk popped open—an event apparently caused by defendant Adams accidentally triggering the Cadillac's alarm deactivator. Though the police had handcuffed Adams, they had not taken his key chain—on which there was a car alarm deactivator—out of his hands.

Seizing on this fortuitous event, Sergeant Ganey looked into the now-open trunk of the yellow Cadillac and saw several items which he believed might conceal controlled substances. He therefore asked that the drug-sniffing dog be led around the car. The dog alerted to some part of the car, although Sergeant Ganey did not know the specific location. Sergeant Ganey then directed that the Cadillac be fully searched. A gun was found under the mat of the front passenger seat. At the time of his arrest, defendant Adams was wearing a fur coat, a Rolex watch and gold chain with a large jewelled pendant.

On November 10, 1992, defendant Adams was charged with a violation of 18 U.S.C. §§ 922(g)(1), 924(a), possession of a firearm by a convicted felon. Defendant Adams subsequently filed a motion to suppress the firearm found in the Cadillac. After an evidentiary hearing, a magistrate judge recom-

---

1. No evidence was presented at the suppression hearing regarding the reliability of the drug-sniffing dog used here. Cf. *United States v. Ornelas-* *Ledesma*, 16 F.3d 714, 721 (7th Cir.1994) (raising questions about Milwaukee Police dog's ability to accurately detect drugs).

mended that the motion be denied. This recommendation was adopted by the district court. Defendant Adams was found guilty of the charge against him and sentenced to 51 month's imprisonment to be followed by three years of supervised release.

### Analysis

Adams' primary claim on appeal is that the district court erred when it denied his motion to suppress the evidence taken from the yellow Cadillac. Defendant Adams also claims that certain evidence admitted at trial was highly prejudicial and should have been excluded and that the prosecutor made comments in her closing statements that were sufficiently prejudicial to require a new trial. However, since we conclude the district court erred when it denied defendant Adams' motion to suppress the admission of the handgun found in the yellow Cadillac, we need not decide the other claims of error.

Prior to trial, defendant Adams moved for the suppression of the essential piece of evidence against him—the handgun found in the Cadillac—claiming it was seized in violation of the Fourth Amendment. Adopting the magistrate judge's recommendation, the district court denied Adams' motion. This Court's review of such a denial is, as the government reminds us, extremely deferential. *United States v. Wilson*, 2 F.3d 226 (7th Cir.1993) (district court's denial of a motion to suppress evidence will not be disturbed unless the decision was clearly erroneous), certiorari denied, —— U.S. ——, 114 S.Ct. 1615, 128 L.Ed.2d 341. But even under the most deferential of standards, it is clear that the critical evidence against defendant Adams was seized in violation of the Fourth Amendment and should have been suppressed.[2]

Although the Fourth Amendment generally prohibits the police from conducting a search without first convincing a neutral magistrate that there is probable cause to justify such an action, the Supreme Court

has recognized that "the exigencies of [a] situation" sometimes exempt a search from the warrant requirement. *McDonald v. United States*, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153. Thus in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, the Supreme Court held that contemporaneous with a lawful custodial arrest a police officer may—without a warrant—search the person of the arrestee and any area into which he might reach in order to grab a weapon or evidentiary material; such a warrantless search, it reasoned, is justified by the need "to remove any weapons that [the arrestee] might seek to use in order to resist arrest or effect his escape" and the need to prevent the concealment or destruction of evidence. *Id.* at 763, 89 S.Ct. at 2040.

In *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768, the Supreme Court applied the general rule articulated in *Chimel* to a recurring factual situation—the search of the interior of an automobile incident to the lawful arrest of one of its occupants. Impelled by the desire to establish a rule that provided clear guidance to police conducting searches in such situations, the Court held that as a contemporaneous incident of the arrest of the occupant of an automobile, the police may search the entire passenger compartment of that automobile. *Id.* at 460, 101 S.Ct. at 2864. The Court reasoned that since "articles inside the relatively narrow compass of the passenger compartment of an automobile are ... generally, if not inevitably, within" the "grab area" of an occupant, police officers may search the interior of an automobile from which an arrestee has been removed without having to establish first that the arrestee could in fact have reached the searched area.

■ Relying on Seventh Circuit cases applying the principles of *Belton*, the government argues that the Milwaukee Sheriff's Department's search of the yellow Cadillac's passenger compartment was permissible

---

**2.** The events leading from the initial stop of defendant Adams to the search of the Cadillac raise numerous Fourth Amendment questions, any one of which could potentially have required the exclusion of the handgun. Since it is clear that the

search of the Cadillac after defendant Adams had been arrested and handcuffed violated the Fourth Amendment, we need not resolve the other Fourth Amendment issues presented by the record.

since it was incident to Adams' lawful arrest.[3] But in *Belton* and all the cases on which the government relies, the arrestee—even if he was not an occupant of the car at the moment of arrest—had been an occupant of the searched car immediately prior to the search. *Belton,* 453 U.S. at 455–456, 101 S.Ct. at 2861–2862; *United States v. Holifield,* 956 F.2d 665, 668 (7th Cir.1992); *United States v. Arango,* 879 F.2d 1501, 1505–1506 (7th Cir. 1989), certiorari denied, 493 U.S. 1069, 110 S.Ct. 1111, 107 L.Ed.2d 1019; *United States v. Karlin,* 852 F.2d 968 (7th Cir.1988), certiorari denied, 489 U.S. 1021, 109 S.Ct. 1142, 103 L.Ed.2d 202.[4] Here, however, not only was the defendant not an occupant of the searched vehicle immediately prior to arrest, he was not affirmatively linked to it until after he was detained and handcuffed. Until Adams accidentally deactivated the yellow Cadillac's alarm, the law enforcement officials on the scene had no reason, other than that he was standing near it, to suspect he was connected to the car. Since defendant Adams was neither an occupant of the searched vehicle nor positively linked to it prior to his arrest, the search here—despite the government's claims to the contrary—does not fall within the scope of *Belton* and its Seventh Circuit progeny.

Rather, the validity of the search at issue here is governed by the general rule regarding searches incident to a lawful custodial arrest set out in *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034. *Chimel* allows police officers to search any area into which an arrestee might reach to remove a weapon or to conceal evidence. Defendant Adams, however, was in no position at the moment of his arrest to remove weapons or evidence from the area searched. At the time he was approached and subsequently arrested by Sergeant Ganey, defendant Adams was standing at the tail of the yellow Cadillac, about three feet from the curb or about even with the middle of the trunk of the car. Unless the defendant possessed extraordinary abilities not revealed in the record, it would have been impossible for him to have reached anything in the passenger compartment of the Cadillac—a location about three-quarters of a car and a locked door away from him. And since the front passenger seat of the Cadillac was not within the defendant's "grab area," the warrantless search of that area violated the Fourth Amendment.

We are, in fact, astonished that the government has pursued this line of argument. Not only is the claim that the search of the yellow Cadillac was motivated by the officers' concerns for their safety implausible on its face, the evidence indicates that this was not in fact the officers' motive. In his testimony, Sergeant Ganey admits that he ordered the Cadillac to be searched "based upon the dog alerting to it" (Transcript Vol. 1, p. 33). A search for hidden drugs, however, requires that there be probable cause to believe that drugs are located in the area to be searched. The government makes no claim here that the officers had probable cause to believe that there were drugs in the passenger compartment of the Cadillac.[5]

---

**3.** Since the search of the yellow Cadillac following Adams' arrest clearly violated the Fourth Amendment, this Court need not decide whether the arrest itself comported with the requirements of the Constitution. We note, however, that the evidence before this Court leaves us with substantial doubts about whether there was probable cause to arrest defendant Adams when he was handcuffed—the point at which the magistrate judge determined the investigatory stop was *transformed into* an arrest. Prior to being stopped, Adams was observed leaving the area of the target residence with a person who fled when law enforcement officials arrived. While this information may have justified an investigatory stop by giving law enforcement officials a reasonable suspicion that Adams was connected with the activities for which the search warrant was issued, it is difficult to conclude that this information coupled with the information revealed by

the investigatory stop (a large roll of money) constituted probable cause for an arrest.

**4.** The government also cites *United States v. Gallman,* 907 F.2d 639, 640–641 (7th Cir.1990), certiorari denied, 499 U.S. 908, 111 S.Ct. 1110, 113 L.Ed.2d 219, but that case is clearly inapplicable since it involved a search for which there was probable cause—not as here a search incident to a lawful arrest—and the government makes no claim that it had probable cause to search the Cadillac.

**5.** And if the government had made such a claim, it would have been met with some skepticism. At the time the search was ordered the evidence suggesting that there were drugs in the car was modest: Adams had been seen leaving a suspected drug house and a drug-sniffing dog of un-

■ Since we hold that the handgun found in the yellow Cadillac was seized in violation of the Fourth Amendment, it is unnecessary to decide the other issues raised by defendant Adams. We note, though, a concern that certain evidence offered to demonstrate that Adams knowingly possessed a firearm had only minimal probative value on the issue, and instead served primarily to suggest impermissibly that he was involved in nefarious activities. The government, for example, offered not only testimony establishing that Adams was, at the time of his arrest, wearing a fur coat, a Rolex watch, and a gold chain and medallion, but also evidence showing the costs of these items. According to the government, "[a]n inference consistent with this evidence is that Adams possessed the [gun found in the Cadillac] in order to protect his valuables" (Br. 24). This Court does not believe that the fact that Adams was wearing expensive clothing makes it more likely than not that he was in possession of a firearm—average citizens do not arm themselves merely because they have chosen to wear flashy clothes and jewelry. The only probable effect of this evidence was to suggest impermissibly to the jury (based on stereotypes of dubious legal legitimacy) that Adams was engaged in illicit activities. Courts must assiduously avoid allowing a trial for a charged offense to become a trial of other uncharged and unsubstantiated activities.

### Conclusion

■ Police officers may, contemporaneous to a lawful arrest, search any area into which the arrestee might reach to hide evidence or to grab a weapon. Since this rationale cannot justify the search conducted here—defendant Adams was not at the time of arrest in a position to grab the weapon located in the front seat of the yellow Cadillac—the district court's denial of defendant's motion to suppress is REVERSED.

known reliability had alerted to a roll of money taken from him and then to some unidentified

portion of the searched car.